**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AYSHA NUDRAT UNUS; HANAA
UNUS,
          *Plaintiffs-Appellants,*
          and

IQBAL UNUS,
          *Plaintiff,*

          v.

DAVID KANE, Special Agent, U.S.
Immigration and Customs
Enforcement; RITA KATZ; ROGER
AARONS, Special Agent, DHS-ICE;
CAMILLE BARNETT, Special Agent,
DHS-ICE; BYRON BRAGGS, Senior
Special Agent, ICE; JENNIFER
CRANDALL, Special Agent, DHS-
ICE; FRANCISCO GERARDO, Special
Agent, ICE; ANTONIO GOMEZ,
Special Agent, IRS; STASIA A.
MCMAHON, Special Agent, IRS;
ELMER R. MOORING, SR., Postal
Inspector; MICHAEL R. O'HANLON,
Special Agent, IRS; KENNETH W.
OLAND, Special Agent, IRS;
UNITED STATES OF AMERICA;
MICHAEL J. ZENS, Special Agent,
United States Secret Service,
          *Defendants-Appellees,*

No. 07-2191

and

ALL UNKNOWN NAMED FEDERAL AGENTS OF THE UNITED STATES CUSTOMS SERVICE, now known as U.S. Immigration and Customs Enforcement, Internal Revenue Service, Bureau of Alcohol, Tobacco and Firearms, Immigration and Naturalization Service, United States Secret Service,

*Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:04-cv-00312-LMB-TRJ)

Argued: December 3, 2008

Decided: May 6, 2009

Before WILLIAMS, Chief Judge, and TRAXLER and
KING, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge King wrote the majority opinion, in which Judge Traxler joined. Chief Judge Williams wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Steven Karl Barentzen, Washington, D.C., for Appellants. R. Joseph Sher, OFFICE OF THE UNITED

STATES ATTORNEY, Alexandria, Virginia; Laura Rose Handman, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Nancy A. Luque, Mitka T. Baker, DLA PIPER US, L.L.P., Washington, D.C., for Appellants. Chuck Rosenberg, United States Attorney, Dennis C. Barghaan, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the Federal Appellees. Brigham J. Bowen, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Appellee Rita Katz.

---

**OPINION**

KING, Circuit Judge:

Plaintiffs Aysha and Hanaa Unus appeal from the judgment entered against them in the Eastern District of Virginia on constitutional and common law tort claims arising from an allegedly unlawful search of their northern Virginia home. They assert that a federal agent, David Kane, and another individual, Rita Katz, contravened the Fourth Amendment by conspiring to make misrepresentations of fact in order to obtain a search warrant for the Unus home. The plaintiffs also maintain that other federal agents violated the First and Fourth Amendments and committed multiple common law torts in carrying out the search.[1] The plaintiffs challenge the dismissal of the claims against Kane and Katz; the dismissal of their constitutional claims against the federal agents who carried out the search; the summary judgment award to the

---

[1]In addition to Agent Kane and Katz, the plaintiffs have identified eleven federal agents as defendants: four Customs agents (Byron Braggs, Jennifer Crandall, Francisco Gerardo, and Roger Aarons); four Internal Revenue Service agents (Stasia McMahon, Antonio Gomez, Michael O'Hanlon, and Kenneth Oland); an Immigration and Naturalization Service agent (Camille Barnett); a Secret Service agent (Michael Zens); and a postal inspector (Elmer Mooring, Sr.).

United States on the tort claims; and the award of attorney's fees to Katz. As explained below, we reverse the fee award and affirm the balance of the judgment.

I.

A.

In March 2002, Iqbal Unus, Ph.D. ("Dr. Unus"), was employed by the Islamic Institute of Islamic Thought (the "IIIT"), a tax-exempt organization located in Herndon, Virginia. Dr. Unus, his wife, Aysha, and their two teenage daughters (including plaintiff Hanaa), lived in a two-story, single-family residence, also in Herndon.[2] All four members of the Unus household were United States citizens, and none had a criminal record.

On March 12, 2002, as part of an extensive federal investigation of a group of entities (including the IIIT) and persons suspected of supporting international terrorism, Agent Kane submitted an affidavit (the "Affidavit") to a federal magistrate judge in support of applications to obtain search warrants for multiple locations, including a search warrant for the Unus residence (the "Warrant").[3] On March 13, 2002, the magistrate judge issued the Warrant and, on March 20, 2002, eleven federal agents and three local police officers executed it. The factual recitation made herein is predicated primarily upon the Affidavit, as well as allegations made by the plaintiffs in their initial complaint, filed on March 23, 2004 (the "Initial Complaint"), and a series of amended complaints filed on November 9, 2004 (the "First Amended Complaint"), August 29,

---

[2]Hanaa Unus was eighteen years old at the time of the underlying events and is a co-plaintiff with her mother. The Unuses' other daughter was not present during the search and is not a plaintiff in these proceedings.

[3]The Affidavit and its related attachments are found at J.A. 54-190, and the Warrant is found at J.A. 2735-38. (Citations herein to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.)

2005 (the "Second Amended Complaint"), and February 5, 2007 (the "Third Amended Complaint").[4] The predicate facts are also derived from discovery proceedings, including depositions of the plaintiffs and the federal agents involved in the search of the Unus residence. In the context of this appeal, the facts are spelled out in the light most favorable to the plaintiffs.

1.

After the September 11, 2001 terrorist attacks in New York, Washington, D.C., and Pennsylvania, the Treasury Department established "Operation Green Quest," a federal multi-agency task force assigned with investigating domestic financial support of international terrorism ("Green Quest"). In 2001, Green Quest began investigating "a group of individuals that [were] suspected of providing material support to terrorists, money laundering, and tax evasion through the use of a variety of related for-profit companies and ostensible charities under their control, most of which [were] located at 555 Grove Street, Herndon, Virginia." Affidavit 2. Green Quest suspected that a "web of companies and charities controlled by these individuals," led by "Middle Eastern nationals living in Northern Virginia," were conspiring to conduct terrorist-related activities in the United States. *Id.* at 2, 6. Although several of these organizations claimed to be educational and charitable in nature, Green Quest suspected that they were in fact merely "paper" organizations of an international terrorist network. *Id.* at 7.

The plaintiffs allege that Green Quest's investigation was informed by the research of Rita Katz, a self-professed expert on the tracking of terrorist organizations and the author of a book detailing her experiences as a researcher of terrorism-

---

[4]The Initial Complaint is found at J.A. 37-49, the First Amended Complaint at J.A. 1038-60, the Second Amended Complaint at J.A. 1583-604, and the Third Amended Complaint at J.A. 1686-705.

related activities in the United States. *See* Anonymous, *Terrorist Hunter* (2003).[5] Although Katz has never been a federal agent, she has consulted with the federal government, providing several federal agencies with information about Islamic organizations operating in the United States.[6] The plaintiffs assert that Katz "espouses a belief that if one is a Muslim, one is a terrorist by virtue of religion," and that she imparted this belief on the federal agents that she trained. First Amended Complaint 5. Green Quest, according to the plaintiffs, latched on to Katz's theory that a widespread terrorist network was operating out of an office building at 555 Grove Street in Herndon, Virginia, and her belief that "all roads of terrorist funding and ideology in America lead to 555." *Id.* at 4 (internal quotation marks omitted). Thus, Katz persuaded Agent Kane, a Green Quest member, to seek search warrants of 555 Grove Street and several related locations, despite having been advised by federal prosecutors that there was no probable cause to search. The plaintiffs observe that Katz referred to herself in her book as Green Quest's "stealthy guiding beam," and that the Safa Group investigation was "[her] investigation, [her] baby, [her] project." *Id.* at 18 (internal quotation marks omitted).

2.

On March 12, 2002 — at Katz's urging — Agent Kane submitted the Affidavit to a magistrate judge in support of search warrant applications for several businesses and residences. Through ninety-nine pages and fifty-two exhibits (after redactions), the Affidavit explained that the federal government had been investigating several suspect entities and individuals, and "[f]or ease of reference," the Affidavit labeled this "web of companies and charities . . . as the 'Safa

---

[5]In her appellate brief, Katz acknowledges that she is the author of *Terrorist Hunter*. *See* Br. of Appellee Katz 8.

[6]According to the plaintiffs, Katz has been paid over $272,000 for work performed for the United States government.

Group.'" Affidavit 2 (emphasis omitted). The Affidavit further explained that a federal investigation into the Safa Group that had been started in the late-1990s had revealed

> a convoluted web of multiple transactions between related corporations and charities that made it virtually impossible for federal investigators to ascertain where the money that finally left the web of the Safa Group ultimately went. Indeed, the current investigation has traced millions of dollars through layers of related companies and to charities in the Isle of Man — from which point the trail cannot be practically followed.

*Id.* at 7-8 (emphasis omitted). By the Affidavit, Kane asserted that "individuals associated with the Safa Group [were] using the various affiliated charities and companies under their control to transfer money in convoluted transactions through a network of inter-related organizations designed to prevent the United States from tracking the ultimate recipients." *Id.* at 8 (emphasis omitted).

After describing terrorist-financing techniques and federal financial-reporting and tax laws, the Affidavit listed several individuals and entities suspected of being involved with international terrorism, explaining their connection to the Safa Group. "Although the Safa Group consists of over 100 interwoven organizations," Agent Kane stated, "the investigation has focused on approximately 20 core organizations, and their associated corporate officers and directors." Affidavit 41 (emphasis omitted). Moreover, the Affidavit specified that

> IRS tax files and corporation documents disclose that 555 Grove Street, 500 Grove Street, and associated addresses in Herndon are the corporate offices of record for over 100 active and defunct corporations, partnerships and tax exempt charitable organizations that are woven together by common officers

and directors. According to the Virginia Secretary of
State, approximately 40 active corporations claim
their offices to be located at 555 Grove Street, alone.

*Id.* at 43.

In particular, the Affidavit explained that IRS Forms 990
and additional tax-related documents for "seven tax-exempt
Safa Group organizations" revealed that many of the organi-
zations had overlapping leadership comprised of persons sus-
pected of supporting terrorism. Affidavit 43 (emphasis
omitted). Labeling these organizations as the "Safa Charities,"
the Affidavit stated that all seven of them were located in
Herndon, with five sharing the same 555 Grove Street
address. *Id.* "Analysis of the above returns and available sup-
porting documentation," the Affidavit explained, "disclosed a
series of transactions between related companies that, when
examined in their entirety, evidences a conspiracy" among
several individuals, "known and unknown, to route money
through hidden paths to terrorists, and to defraud the United
States." *Id.* at 44. Furthermore, the Affidavit explained that
"the pattern of grants and allocations made does not demon-
strate the Safa Charities are operating for an exempt purpose,"
an assertion that Kane supported with extensive financial
data. *Id.* at 45 (emphasis omitted). Instead, "[t]he vast major-
ity of funds" leaving the Safa Charities, Kane maintained,
were transferred to two purportedly charitable trusts located
on the Isle of Man, both of which had officers or trustees who
were connected to the Safa Group. *Id.* at 47. Kane stated that
these transactions were intended to mask the true nature of the
transactions — financing terrorism.

Pertinent to these proceedings, the Affidavit listed Dr. Unus
as the director of one Safa Group organization (the Child
Development Foundation), an advisor to two others (the Ster-
ling Charitable Gift Fund and the Sterling Management
Group), as well as the "administrative and billing contact for
web sites" for two more (the IIIT and the FIQH Council of

North America). Affidavit 38. Because of Dr. Unus's positions in these organizations, Agent Kane believed that Dr. Unus had access to Safa Group financial records. Furthermore, Kane stated that a "trash run" — which the plaintiffs allege was conducted by Katz — had recovered trash disposed of at the Unus residence, and that "[v]arious documents were found, indicating that Unus maintains [Safa Group financial] records at his house." *Id.* at 96-97 (emphasis omitted). Based on such information, Kane swore there was "probable cause to believe that evidence of [federal law] violations" would be found at the Unus residence in the form of Safa Group financial records. *Id.* at 98.

3.

Predicated upon the information submitted in the Affidavit, the magistrate judge found that probable cause existed and issued the Warrant. The Warrant targeted twenty separate categories of documents and things, focusing the search of the Unus residence on evidence of money laundering, tax evasion, and material support of terrorism.

On March 20, 2002, beginning at approximately 10:30 a.m., eleven federal agents, along with three uniformed Fairfax County police officers, executed the Warrant, simultaneously with the execution of other search warrants issued by the magistrate judge in connection with the Green Quest investigation.[7] Agent Oland initiated the search of the Unus residence, pounding on the front door and ordering the occupants to open it. At that time, plaintiff Aysha Unus (Dr. Unus's wife) was in the rear of the home, in the living room, and plaintiff Hanaa Unus (one of the Unuses' daughters), was upstairs, asleep in her bedroom. Aysha heard the officers pounding on the front door, moved a few feet, and again heard the pounding, this time accompanied by a voice com-

---

[7]The three uniformed Fairfax County police officers are not named as defendants here.

manding her to open the door. When she got within about fifteen feet of the front door, she saw a gun through a side window. She then inched closer to the door, getting within about ten feet of it.

Frightened and confused, Aysha Unus began "screaming for [Hanaa]," J.A. 5429, and as Hanaa came downstairs, Aysha retreated to the rear of the Unus residence, towards a sliding glass door that opened to the backyard. Hanaa then joined her mother on the first floor of the house, and they went into the living room and called 911. At this time, the officers broke through the front door with a battering ram. Agent Aarons entered the Unus residence with his firearm drawn and moved to the rear of the house. As Hanaa described it, "You could hear [the agents] break something, the wood or whatever, and they just came storming in. It was a bunch of them, and one of them had a gun . . . pointed at me, and he was yelling at me to drop the phone and put my hands up." *Id.* at 5436. Aarons then instructed Hanaa to sit on the floor, handcuffed her hands behind her back, and placed her in a chair in the living room. As this occurred, Agent Oland handcuffed Aysha with her hands behind her, and placed her on a sofa in the living room. The officers then began searching the Unus residence in accordance with the Warrant. After an initial sweep of the house, an agent showed a copy of the Warrant to Aysha.

During the search, Aysha and Hanaa Unus remained handcuffed in the family room of their residence for nearly four hours. During this time, the agents permitted the women to use the restroom upon request, and they allowed Aysha to self-administer her diabetes medication. Around 2:00 p.m., the women informed the officers that they were obliged to perform their afternoon prayers and a ritual cleansing, in accordance with their Muslim faith. An agent acceded to this request and removed their handcuffs, allowing them to perform their prayers. Despite being allowed to pray, the plaintiffs were not allowed to do so outside the presence of the

male agents, nor were they allowed to wear head scarves or cover their hands while the male agents were present, or while being photographed. After they prayed, the two women were no longer handcuffed, but remained confined to the living room for the duration of the search. At the conclusion of the search, the agents seized two computers and six boxes of documents from the Unus residence, leaving with the plaintiffs a copy of the Warrant and a written inventory of the items seized.[8]

### B.

### 1.

On March 23, 2004, Aysha and Hanaa Unus, along with Dr. Unus, filed the Initial Complaint against Agent Kane, Katz, and "Unknown Named Federal Agents."[9] The Initial Complaint alleged five separate claims, all of which implicated the Unknown Named Federal Agents, and three of which implicated both Kane and Katz. These claims were as follows:

- *Conspiracy to violate the plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights* (the "*Bivens* conspiracy claim").[10] All defendants conspired "to fabricate evidence in support of a search warrant to search the Plaintiffs' home." Initial Complaint 9.

---

[8]According to the plaintiffs, "[m]ost of the documents taken from the Unus home were returned." Br. of Appellants 18. Furthermore, the Green Quest investigation did not result in any arrests or indictments.

[9]Although Dr. Unus was named as a plaintiff in the Initial Complaint, he was not a plaintiff in the subsequent complaints and is not a party to this appeal.

[10]The plaintiffs sued the defendants, in part, directly under the Constitution, pursuant to the Supreme Court's 1971 decision in *Bivens v. Six Unknown Named Fed. Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971) (authorizing award of money damages against individual federal officers for violations of Fourth Amendment).

- *Violation of the plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights* (the "substantive *Bivens* claim"). All defendants violated the plaintiffs' constitutional rights by making material misrepresentations of fact "to support the search of Plaintiffs' home after they knew that there was no probable cause for same," as well as in unreasonably executing the Warrant. Initial Complaint 10.

- *Conspiracy to interfere with the plaintiffs' civil rights* (the "§ 1985 claim"). All defendants engaged in a conspiracy, "motivated by a specific class-based, invidiously discriminatory animus to deprive Plaintiffs of" equal protection of the law. Initial Complaint 11.

- *Assault and battery*. The Unknown Named Federal Agents assaulted Aysha and Hanaa Unus "when they barged into their home with guns in their faces and yelled at them to drop the telephone and put their hands up," and battered the women by unreasonably handcuffing them for four hours. Initial Complaint 11-12.

- *False imprisonment*. The Unknown Named Federal Agents falsely imprisoned Aysha and Hanaa Unus "by directly restraining them of their physical liberty without adequate legal justification." Initial Complaint 11.

The Initial Complaint sought both compensatory and punitive damages from the defendants, as well as attorney's fees under 28 U.S.C. § 1988.

On September 13, 2004, Agent Kane and Katz separately moved under Federal Rule of Civil Procedure 12(b)(6) for dismissal of the Initial Complaint. On October 29, 2004, the

district court dismissed the claims against Kane and Katz without prejudice. From the bench, the court explained that the Initial Complaint failed to identify "the specific allegedly false statements that are in the affidavit and a description of why that falsity would be material to the ultimate finding of probable cause." J.A. 1032.

### 2.

On November 9, 2004, Aysha and Hanaa Unus filed the First Amended Complaint, again naming Agent Kane, Katz, and "Unknown Named Federal Agents" as defendants, and once again pleading the claims made in the Initial Complaint. In an effort to allege their claims with greater specificity, the plaintiffs added additional and more particularized factual allegations.

On January 11, 2005, in response to Rule 12(b)(6) motions filed by Agent Kane and Katz, the district court dismissed the First Amended Complaint, as to all defendants, with prejudice. In so ruling, the court explained from the bench that it had "found by reading the entire affidavit," as well as "by looking at the specific allegations . . . in the amended complaint," that the plaintiffs had "not sufficiently alleged" that Kane and Katz had made material misrepresentations of fact in the Affidavit. J.A. 1161. The court observed that, in light of "the totality of the information provided [in the Affidavit] and the multiple examples of layering and other types of highly suspicious financial transactions among and between these various groups . . . [,] this affidavit establishes probable cause and did for this particular search." *Id.* at 1150.

On February 10, 2005, the plaintiffs moved the district court to reconsider its dismissal of the First Amended Complaint. On March 11, 2005, the court denied reconsideration with respect to Agent Kane and Katz, but granted such relief on the claims against the Unknown Named Federal Agents. *See Unus v. Kane*, No. 1:04-cv-00312 (E.D. Va. Mar. 11,

2005) (the "Reconsideration Order").[11] Kane was entitled to qualified immunity, the court explained, because "none of the alleged misrepresentations described in the Amended Complaint constitutes a material false statement, as would be required to deny Kane qualified immunity from the claims against him." *Id.* at 3. Furthermore, the court denied reconsideration of the claims against Katz, explaining that, because "the affidavit [was] sufficient to support the search and not premised on material misrepresentations, defendant Katz, who supplied information to Kane for the affidavit but is not a government employee, also cannot be liable for the claims stated in the Amended Complaint." *Id.* The court vacated, however, that aspect of its January 11, 2005 order dismissing the claims in the First Amended Complaint against the Unknown Named Federal Agents, granting the plaintiffs a period of forty-five days to conduct discovery on the execution of the search of the Unus residence, in order to permit them to identify the Unknown Named Federal Agents and properly serve them.[12]

3.

On April 28, 2005, the district court ruled, in response to a motion filed by Katz, that the provisions of 42 U.S.C. § 1988 authorized her to recover attorney's fees for successfully defending the *Bivens* conspiracy and § 1985 claims in the First Amended Complaint. *See Unus v. Kane*, No. 1:04-cv-00312 (E.D. Va. Apr. 28, 2005) (the "Fee Order").[13] Although attorney's fees are not available in a *Bivens* action, the court observed that they are available for the successful defense of a § 1985 claim. In these proceedings, the court

_____

[11]The Reconsideration Order is found at J.A. 1185-89.

[12]The district court also observed, in a footnote to the Reconsideration Order, that "[a]ny Second Amended Complaint may not include claims against defendants Kane and Katz, against whom this action is dismissed with prejudice." Reconsideration Order 5 n.5.

[13]The Fee Order is found at J.A. 1422-27.

ruled, the *Bivens* claims and the § 1985 claim "arose from the same nucleus of operative facts." *Id.* at 2. Thus, the court explained, "Katz defended against two closely related constitutional claims that were both dismissed based upon the same finding that no constitutional violation occurred." *Id.* at 3. Because of the interrelationship of the claims made against Katz, the court concluded that § 1988 authorized an attorney's fee award to her for the time spent defending the *Bivens* conspiracy and § 1985 claims, as alleged in the First Amended Complaint.

The district court then assessed whether such an award was appropriate under the circumstances. "To merit a fee award under § 1988," the court observed, "a prevailing defendant must demonstrate that the claims against her were 'frivolous, unreasonable or groundless' or that 'the plaintiff continued to litigate after [the claims] clearly became so.'" Fee Order 3 (quoting *Hutchinson v. Staton*, 994 F.2d 1076, 1080 (4th Cir. 1993)). Here, the court explained, "although plaintiffs may not have been aware when they filed the [Initial] Complaint that their claims were groundless, they should have been so aware before they filed the [First] Amended Complaint." *Id.* at 5. Thus, the court concluded, Katz was entitled to an award of fees in connection with her defense of the First Amended Complaint. As a result, on July 25, 2005, the court awarded the sum of $41,105.70 — $36,856.20 for attorney's fees and $4,249.50 for costs — which it calculated as the fees and costs incurred by Katz after the filing of the First Amended Complaint.[14]

4.

On August 29, 2005, the plaintiffs filed their Second

---

[14]In requesting an award of costs, Katz relied on Federal Rule of Civil Procedure 54(d)(1), which provides, in pertinent part, that "costs — other than attorney's fees — should be allowed to the prevailing party." In this appeal, the plaintiffs do not challenge the award of costs to Katz.

Amended Complaint, replacing the designation of "Unknown Named Federal Agents" with the identities of the eleven federal agents who had conducted the search of the Unus residence (the "federal agent defendants"). *See supra* note 1. Naming the federal agent defendants only, the Second Amended Complaint alleged five causes of action:

- *Violation of the plaintiffs' First and Fourth Amendment rights* (respectively, the "First Amendment *Bivens* subclaim" and the "Fourth Amendment *Bivens* subclaim"). The federal agent defendants violated the plaintiffs' First Amendment rights by preventing the plaintiffs from freely exercising their religion by not allowing them to wear their headscarves while being photographed, and by not allowing them to pray outside the presence of the male agents. The federal agent defendants contravened the plaintiffs' Fourth Amendment rights by using "unconstitutional and excessive force in effectuating the search." Second Amended Complaint 17.

- *Assault and battery*. The federal agent defendants assaulted and battered the plaintiffs when they "descended upon plaintiffs' home *en masse* with their guns drawn, failed to identify themselves or show a warrant, broke down the plaintiffs' front door, forcibly entered the premises and handcuffed Plaintiffs." Second Amended Complaint 20.

- *False imprisonment*. The federal agent defendants restrained the plaintiffs "without legal justification when they handcuffed plaintiffs, and held them handcuffed in their family room without allowing them to leave for over four hours while they searched plaintiffs' home." Second Amended Complaint 19.

- *Aiding and abetting.* The federal agent defendants each "knew of, substantially assisted and aided and abetted each of the other Federal Agents violating" the plaintiffs' constitutional rights, as well as assaulting, battering, and falsely imprisoning the plaintiffs. Second Amended Complaint 21.

- *Conspiracy.* The federal agent defendants each "entered into an agreement and conspired with each other to violate" the plaintiffs' constitutional rights, as well as to assault, batter, and falsely imprison the plaintiffs. Second Amended Complaint 21.

On December 9, 2005, the United States substituted itself as a party defendant in the Second Amended Complaint — in the place and stead of the federal agent defendants — for the assault-and-battery and false imprisonment claims, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2679(d)(1) (the "FTCA").[15] The United States then moved to dismiss each of those claims, asserting that the court lacked jurisdiction over them because the plaintiffs had failed to file the administrative claims mandated under the FTCA.[16]

On February 3, 2006, the district court granted the motion of the United States to dismiss the assault-and-battery and false imprisonment claims without prejudice, authorizing the plaintiffs a period of sixty days to file the appropriate admin-

---

[15]The FTCA mandates that, "[u]pon certification by the Attorney General that the defendant employee [of the United States] was acting within the scope of his office or employment at the time of the incident out of which the claim arose, . . . the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1).

[16]In order for a federal court to exercise jurisdiction over a tort claim against the United States, the FTCA requires that the claim be "first presented . . . to the appropriate Federal agency" and that it be "finally denied" by the agency. 28 U.S.C. § 2675(a).

istrative claims. The court also stayed the First Amendment *Bivens* subclaim for a period of eight months, pending the outcome of the administrative claims. The court then dismissed with prejudice the Fourth Amendment *Bivens* subclaim, along with the aiding-and-abetting and conspiracy claims. It ruled that the federal agent defendants were entitled to qualified immunity on the Fourth Amendment *Bivens* subclaim, and that there was no legal basis upon which either the aiding-and-abetting claim or the conspiracy claim could proceed.

### 5.

On February 5, 2007, the plaintiffs filed their Third Amended Complaint, repleading the First Amendment *Bivens* subclaim against the federal agent defendants, along with the assault-and-battery and false imprisonment claims, as well as a new trespass claim, against the United States.[17] On March 12, 2007, the federal agent defendants and the United States responded to the Third Amended Complaint with motions to dismiss filed pursuant to Rule 12(b)(6).

By order of May 11, 2007, the district court dismissed with prejudice the First Amendment *Bivens* subclaim against the federal agent defendants, ruling that this subclaim was barred by the applicable statute of limitations, in that the Second Amended Complaint did not relate back to the filing of the Initial Complaint. The court denied, however, the motion of the United States to dismiss the assault-and-battery, false imprisonment, and trespass claims.

On September 12, 2007, the plaintiffs requested that the court reconsider its dismissal of the First Amendment *Bivens*

---

[17]The trespass claim, first made in the Third Amended Complaint, alleged that the federal agent defendants' decision to break down the plaintiffs' front door and enter their residence constituted "an unauthorized entry onto Plaintiffs' property." Third Amended Complaint 19.

subclaim, in light of our decision in *Goodman v. Praxair*, 494 F.3d 458 (4th Cir. 2007) (en banc) (addressing doctrine of "relation back" concerning pleadings), which had been rendered on July 25, 2007. In response, the court ordered additional briefing on the relation-back issue.

Finally, on November 2, 2007, the district court granted summary judgment to the United States on the assault-and-battery, false imprisonment, and trespass claims. The court explained that there was no genuine issue of material fact with regard to those claims — the agents acted reasonably under the circumstances known to them at the time of their conduct, and summary judgment was therefore appropriate. Then, notwithstanding its earlier order for additional briefing, the court dismissed the First Amendment *Bivens* subclaim against the federal agent defendants as moot.

Their various claims having been either dismissed or subject to adverse summary judgment awards, and final judgment having been entered by the district court on November 2, 2007, the plaintiffs timely noted this appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

An award of summary judgment is reviewed de novo. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 217 (4th Cir. 2009). Summary judgment is appropriate only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In disposing of a summary judgment request, a district court must view the evidence in the light most favorable to the non-moving party. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

We also review de novo a district court's dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6), examining whether the plaintiffs' pleadings have adequately stated

facts, which, if proven to be true, would entitle them to relief. *See Duckworth v. State Admin. Bd. of Election Laws*, 332 F.3d 769, 772 (4th Cir. 2003). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege enough facts "'to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Additionally, a district court's dismissal on qualified immunity grounds is reviewed de novo. *See Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001).

We review de novo a district court's conclusion that an attorney's fee award may appropriately be made. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 766 (4th Cir. 2003). The court's decision to award such fees, however, is reviewed for abuse of discretion. *See Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998).

## III.

The plaintiffs present five separate contentions of error on appeal. First, they maintain that the district court erred in entering summary judgment in favor of the United States on the assault-and-battery and false imprisonment claims. Second, the plaintiffs challenge the court's dismissal of the First and Fourth Amendment *Bivens* subclaims against the federal agent defendants. Third, the plaintiffs maintain that the court improperly concluded that Agent Kane is entitled to qualified immunity on the substantive *Bivens* claim against him. Fourth, the plaintiffs assert that the court erroneously dismissed the *Bivens* conspiracy and § 1985 claims against Katz. And finally, they contend that the court erred in awarding attorney's fees to Katz. We assess each of these contentions in turn.[18]

---

[18]On appeal, the plaintiffs do not challenge the district court's disposition of the trespass, aiding-and-abetting, and conspiracy claims against the

## A.

We first address the plaintiffs' assertion that the district court erroneously entered summary judgment in favor of the United States on the assault-and-battery and false imprisonment claims. In that respect, the court explained from the bench that the federal agent defendants had acted "reasonabl-[ly] under the circumstances known to the officers at the time they took their action." J.A. 5720. The plaintiffs contend that the court erred by failing to properly view the facts and draw all inferences in their favor, as it was obliged to do in considering a summary judgment motion. In particular, they assert that the court failed to consider statements by certain of the federal agent defendants indicating that, at the time of the search, they were not subjectively concerned about the Unus residence being connected to terrorism-related activity, and that they did not anticipate that the residence might house weapons or dangerous persons. *See, e.g.*, J.A. 2927-29, 3190-92, 4315-16, 4348-50, 4593-94, 4809-10. Thus, the plaintiffs maintain, the federal agent defendants' use of force in executing the Warrant was unreasonable, and summary judgment was inappropriate. As explained below, we disagree with this contention and thus affirm the summary judgment award on the assault-and-battery and false imprisonment claims.

To properly review the summary judgment award on the assault-and-battery and false imprisonment claims, we must first identify the legal principles governing their adjudication. As previously explained, on December 9, 2005, the United States substituted itself for the federal agent defendants as the proper defendant on the common law tort claims. Upon that substitution, the common law tort claims against the federal agent defendants became claims against the United States.[19]

---

United States; the dismissal of the *Bivens* conspiracy and § 1985 claims against Agent Kane; the dismissal of the substantive *Bivens* claim against Katz; or the award of costs to Katz.

[19]The plaintiffs do not challenge the propriety of the substitution of the United States as the defendant on the FTCA claims.

The FTCA does not itself provide for a substantive cause of action. Rather, in assessing FTCA claims, we apply the substantive law of the state where the alleged tort took place: in this case, the law of the Commonwealth of Virginia. *See* 28 U.S.C. § 1346(b); *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001).

Having identified the controlling body of law, we look to Virginia's definitions of assault, battery, and false imprisonment. In Virginia, a false imprisonment is "'the direct restraint by one person of the physical liberty of another without adequate legal justification.'" *Figg v. Schroeder*, 312 F.3d 625, 637 (4th Cir. 2002) (quoting *Jordan v. Shands*, 500 S.E.2d 215, 218 (Va. 1998)). Virginia defines a battery as "an unwanted touching which is neither consented to, excused, nor justified," and an assault as "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garrett*, 574 S.E.2d 258, 261 (Va. 2003). A legal justification for the act being complained of will defeat an assault or battery claim. *See id.* Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties. *See, e.g.*, *Pike v. Eubank*, 90 S.E.2d 821 (Va. 1956). Thus, in assessing the summary judgment award, we must assess whether the federal agent defendants acted reasonably under Virginia law.

In Virginia, "[a] police officer's conduct in executing a search warrant is judged in terms of its reasonableness within the meaning of the fourth amendment to the United States Constitution and Article I, § 10 of the Constitution of Virginia." *Lewis v. Commonwealth*, 493 S.E.2d 397, 399 (Va. Ct. App. 1997) (internal quotation marks omitted). A determination of reasonableness requires the balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Young v. Prince George's County, Md.*,

355 F.3d 751, 757 (4th Cir. 2004) (internal quotation marks omitted). Importantly, an officer's conduct must be assessed for *objective* reasonableness; his *subjective* motivations have no bearing on our inquiry. *See id.* at 758-59. This "calculus of reasonableness," we have carefully explained, "must embody allowances for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain and rapidly evolving — about the amount of force that is necessary in a particular situation." *Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir. 2001). Finally, in applying these principles, the reasonableness of an officer's actions in connection with the execution of a search warrant must be assessed in light of the circumstances that existed at the time. *See id.*

1.

We begin our analysis with the assault claim, being mindful that Virginia has recognized that "the safety of the officer when conducting his duties is of paramount importance." *Harris v. Commonwealth*, 400 S.E.2d 191, 194 (Va. 1991) (internal quotation marks omitted). In this claim, the plaintiffs assert that the federal agent defendants assaulted them by forcing entry into the Unus residence with a battering ram, and also by pointing firearms at them during the initial entry into the residence.

First, the forced entry by the federal agent defendants into the Unus residence was reasonable and did not constitute an assault. In Virginia, "[p]rior to forcing entry into a dwelling, police must: (1) knock; (2) identify themselves as police officers; (3) indicate the reason for their presence; and (4) wait a reasonable period of time for the occupants to answer the door." *Lewis*, 493 S.E.2d at 399 (internal quotation marks omitted). We have explained that "the time which must elapse after knocking and announcing [the officer's] identity and purpose before breaking and entering varies with the exigencies of each case." *United States v. Ward*, 171 F.3d 188, 193-

94 (4th Cir. 1999) (internal quotation marks omitted). In executing the Warrant, Agent Oland acknowledged that he "pounded" on the door, identified himself as the "police," announced that he had a warrant, and ordered the occupants of the residence to "open the door." J.A. 2944-45.[20] Oland saw Aysha Unus through the window next to the front door and, after repeating his command to open the door, he watched her run "down the hallway to the back of the house." *Id.* at 2948. This period of time — though less than a minute — constituted, in these circumstances, a reasonable wait by the agents.[21] In assessing reasonableness, we see the federal agent defendants as entitled to consider the failure of the plaintiffs to open the door as a refusal to permit entry in accordance with the Warrant, and they were thus justified in forcing entry into the residence. *Cf. Mensh v. Dyer*, 956 F.2d 36, 40 (4th Cir. 1992) (recognizing that forced entry was justified after officers heard "the sound of running feet").

Second, the pointing of firearms at the plaintiffs upon entry into the Unus residence was reasonable under the circumstances. Upon the failure of the occupants to permit the officers to enter in accordance with the Warrant, the officers were entitled to forcibly enter, where they immediately encountered two persons unknown to them, one of whom was on a telephone. In that circumstance, the officers were reasonably entitled to believe that the drawing of weapons was necessary in order to gain control of a fluid situation and ensure the safety of all involved. *See Michigan v. Summers*, 452 U.S. 692, 702-

---

[20]In addition to Agent Oland's verbal announcement identifying himself and the other agents as the authorities, visual indicators identified them as such. The federal agent defendants wore badges around their necks, and the three Fairfax County police officers were in uniform.

[21]The time period between Agent Oland's initial knock and the forced entry into the Unus residence was sufficient for Aysha Unus to get up from the couch, place her breakfast bowl on the table, slowly walk toward the front door, run to the rear of the residence, call out to her daughter Hanaa (who was asleep upstairs), and then for Hanaa to come downstairs, join her mother, and call 911.

03 (1981) ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."). Indeed, the record reflects that the federal agent defendants drew their weapons only long enough to ensure their safety and control of the situation — once the plaintiffs complied with the agents' directives, the weapons were holstered.

To be sure, the federal agent defendants' forced entry into the Unus residence must have been a harrowing experience for the plaintiffs. The federal agent defendants were entitled, however, to exercise lawful force in entering the Unus residence, and they thus acted reasonably in drawing and pointing their weapons. We thus affirm the district court's summary judgment award on the assault claim in favor of the United States.

2.

We next assess the plaintiffs' false imprisonment and battery claims, which they contend should be allowed to proceed in the district court. The plaintiffs contend that the federal agent defendants battered them by handcuffing them upon entry into the Unus residence, and that the agents falsely imprisoned them by detaining them in handcuffs in the living room for several hours while the Warrant was executed.

It has been consistently recognized that the Fourth Amendment protects a citizen's right to be free from unreasonable seizures. *See Valladares v. Cordero*, 552 F.3d 384, 388 (4th Cir. 2009). In *Michigan v. Summers*, however, the Supreme Court explained that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705. Moreover, in *Muehler v. Mena*, the Court observed that "[i]nherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate

the detention." 544 U.S. 93, 98-99 (2005). In his concurring opinion in *Mena*, Justice Kennedy further explained that "[t]he use of handcuffs is the use of force," and that the employment of "such force must be objectively reasonable under the circumstances." *Id.* at 103 (Kennedy, J. concurring) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).[22]

In *Mena*, the Court reviewed the reasonableness of the two to three hour detention of a woman in handcuffs in her garage — along with three other occupants of her house — while police officers conducted a warranted search of the house for weapons and a wanted gang member. *See* 544 U.S. at 96. Examining the circumstances surrounding that assertedly unlawful detention, the Court concluded that the officers' use of handcuffs for the duration of the search was reasonable, "because the governmental interests outweigh[ed] the marginal intrusion." *Id.* at 99. Indeed, Chief Justice Rehnquist carefully explained that the length of a detention in handcuffs — even though somewhat lengthy — must be balanced against "the government's continuing safety interest." *Id.* at 100. The fact that the officers were searching a "gang house for dangerous weapons" justified such a detention, even though the plaintiff was not herself a target of the search. *Id.*

In this case, viewing the facts surrounding the false imprisonment claim in the light most favorable to the plaintiffs, the plaintiffs were unquestionably "seized," as they were confined to their living room for several hours (mostly in handcuffs)

---

[22]The plaintiffs seek to distinguish the *Summers* and *Mena* decisions from this case on the ground that the detentions in those cases were permissible because the operative search warrants commanded a search for contraband, whereas the Warrant focused solely on financial documents. We see this as a distinction without a difference, however, as the rationale underlying *Summers* and *Mena* applies equally to situations where agents are seeking evidence of federal crimes. *See United States v. Photogrammetric Data Serv., Inc.*, 259 F.3d 229, 239 (4th Cir. 2001) (recognizing reasonableness of detention of occupants during search for records), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

while their residence was being searched. Their seizure was not, however, unreasonable. The federal agent defendants were executing a facially valid search warrant for the Unus residence, and the plaintiffs were — unfortunately for them — occupants of the residence at the time of the search. Under the *Summers* precedent, it was reasonable for the federal agent defendants to detain the plaintiffs during the search. *See Mena*, 544 U.S. at 98 ("Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed . . . and she was an occupant. . . .").

Notwithstanding the reasonableness of the plaintiffs' detention during the search, however, there remains an issue of whether the manner of their detention — specifically, the handcuffing — was unreasonable. *See Mena*, 544 U.S. at 99 (explaining that applying handcuffs constitutes "separate intrusion"). In order for a handcuffing such as this to be reasonable, "the governmental interests" being invoked must have "outweigh[ed] the marginal intrusion" on the plaintiffs. *Id.* at 99-100. A determination of the permissible time during which an occupant of a searched premises may be detained in handcuffs requires the authorities to objectively balance the interests of safety and orderly execution of a warrant against the occupants' interests in not being restrained in handcuffs.

Put simply, the federal agent defendants' decision to initially handcuff the plaintiffs upon entry into the Unus residence was reasonable. Although they were searching for financial documents only — and not for either weapons or persons — a reasonable officer would have had legitimate safety concerns under these circumstances. The agents were executing a duly issued search warrant — one of several related warrants being executed that day — at a residence believed to contain evidence of money laundering by entities suspected of assisting international terrorism. Viewed objectively, the agents did not know whether they would be confronted by resistance. And, upon entry into the Unus residence, the agents encountered hectic conditions. Agent

McMahon, the search team leader, stated that, upon entering the residence, there was "excitement" in the plaintiffs' voices, and the plaintiffs were "clearly concerned and worried and agitated." J.A. 4680, 4687. She explained that there was a "possibility that [the plaintiffs] would take some action that would make an unstable situation and that [the agents] would have to do something to get control again." *Id.* at 4689. Therefore, initially handcuffing the plaintiffs was a reasonable decision — in order to preserve officer and occupant safety and to properly execute the Warrant — and the agents' conduct was thus reasonable.[23]

Furthermore, it was not unreasonable for the federal agent defendants to keep the plaintiffs detained in handcuffs for nearly four hours. Agent McMahon stated that the plaintiffs were placed in handcuffs because the agents were executing a "terrorism-related warrant" and because the plaintiffs had "acted a certain way at the time of entry." J.A. 4694. McMahon further explained that, after "things had calmed down a bit," she moved the handcuffs from the back to the front of the plaintiffs to make them more comfortable. *Id.* at 4702. At that point, however, McMahon explained that she "simply wasn't comfortable . . . going from cuffed to totally not cuffed." *Id.* at 4704. The agents reassessed the situation as the search progressed, however, entirely removing the handcuffs after the women performed their afternoon prayers. "It was a progression of just a general sense of we're progressing with the warrant," McMahon explained. *Id.* at 4727. "[I]t was just a different moment," McMahon recalled, "and I made a different decision [to remove the handcuffs]." *Id.*

---

[23]We observe that the fact that the Warrant did not concern the plaintiffs personally is of no import. *Mena* explained that "when a neutral magistrate has determined that police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.'" 544 U.S. at 99 n.2 (quoting *Summers*, 452 U.S. at 703-04).

It is thus clear that the federal agent defendants reasonably assessed the circumstances presented, balancing the law enforcement interest of safety — of both the agents and the plaintiffs — with the "marginal intrusion" imposed on the plaintiffs. *See Mena*, 544 U.S. at 99. As such, there is no genuine issue of material fact, and the district court correctly awarded summary judgment to the United States.

B.

We now turn to the plaintiffs' challenge to the district court's dismissal of the First and Fourth Amendment *Bivens* subclaims against the federal agent defendants. In the First Amendment *Bivens* subclaim, the plaintiffs contend that the agents violated their rights to freely exercise their religion by (1) preventing them from wearing headscarves and covering their hands in front of the male agents, (2) photographing them without allowing them to wear their headscarves, and (3) preventing them from performing their prayers and ritual cleansing outside the presence of the male agents. By the Fourth Amendment *Bivens* subclaim, the plaintiffs assert that the agents seized them without probable cause when they were detained during the execution of the Warrant.

By order of May 11, 2007, the district court ruled that the agents were entitled to qualified immunity on the Fourth Amendment *Bivens* claim. Then, on November 2, 2007, the court entered summary judgment on the FTCA claims and dismissed the First Amendment *Bivens* subclaim, ruling that it was moot. As explained below, because judgment has been entered on the FTCA claims in favor of the United States, the *Bivens* subclaims against the federal agent defendants are statutorily barred, and we affirm the dismissals of these claims.

In pursuing an intentional tort claim against a federal law enforcement officer, a prospective plaintiff may pursue two alternative avenues of relief. She may either pursue a constitutional claim against the officer directly under the Constitution,

as recognized in *Bivens*, or she may file a tort claim under the FTCA. Should a plaintiff pursue the latter course, she runs the risk that her constitutional claim will be subject to the FTCA's "judgment bar" provision, which specifies that

> [t]he judgment in an action under [the FTCA] shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim.

28 U.S.C. § 2676.

We have not heretofore assessed the scope and ambit of the FTCA judgment bar provision. The plaintiffs contend that its reach is limited to those situations where a plaintiff has alleged the same wrong in a *Bivens* claim as in a separate FTCA claim. As such, the plaintiffs maintain that the district court's judgment against them on the FTCA claims does not foreclose their First and Fourth Amendment *Bivens* subclaims, because those subclaims are predicated on different conduct and allege distinct injuries from the FTCA claims.

Contrary to the plaintiffs' assertions with respect to the scope of § 2676, our sister circuits have consistently viewed the FTCA judgment bar provision as precluding a *Bivens* claim against a government employee when a judgment has been entered on a FTCA claim "arising out of the same actions, transactions, or occurrences" as the *Bivens* claim. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 858 (10th Cir. 2005); *see also Manning v. United States*, 546 F.3d 430, 431 (7th Cir. 2008) (recognizing that judgment on FTCA claim bars *Bivens* claim raised in same suit); *Harris v. United States*, 422 F.3d 322, 333-35 (6th Cir. 2005) (same); *Arevalo v. Woods*, 811 F.2d 487, 490 (9th Cir. 1987) (same).

Indeed, the text of § 2676 plainly supports this interpretation of the judgment bar's scope. In order for § 2676 to have

effect, it must encompass all of the claims that could have been brought with regard to the conduct at issue against the responsible "employee of the government." In its recent *Manning* decision, the Seventh Circuit explained that the plain language of § 2676 reveals that Congress intended for the judgment bar to operate against claims brought against a defendant for the conduct underlying the "action," as that term is used in § 2676. *See* 546 F.3d at 433. The term "action," the court observed, "incorporates all elements of a civil suit, including the claims within that suit." *Id.* (citing *Black's Law Dictionary* 31 (8th ed. 2004)). Thus, "[b]y acting as a bar to *any* action, § 2676 bars the claims within that action." *Id.* at 434. Because a claim is a lesser part of an action, all related claims must come within the ambit of § 2676. In contrast, under the plaintiffs' interpretation, § 2676 would bar "any action," but would not bar pieces of that action, i.e., certain individual claims. Such a reading would be inconsistent with the text of the statute.

Litigants frequently face tough choices — choices that rarely come without consequence. In these proceedings, the plaintiffs chose to pursue their claims against the federal agent defendants through *Bivens* as well as under the FTCA. As such, they risked having a judgment on the FTCA claims operate to bar their *Bivens* theories. As explained above, the district court properly awarded summary judgment to the United States on the FTCA claims. Those claims arose out of the "same subject matter" as the First and Fourth Amendment *Bivens* subclaims — the execution of the Warrant — by the "employee of the government whose act or omission gave rise to the claim," i.e., the federal agent defendants. As such, the court's summary judgment award on the FTCA claims triggers the judgment bar provision of § 2676, and the plaintiffs' First and Fourth Amendment *Bivens* subclaims against the federal agent defendants are thus barred.

We observe, however, that the FTCA's judgment bar provision only applies to "an action . . . against the employee of the

government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. The plaintiffs' FTCA claims sought relief for intentional torts by the federal agent defendants only; they were not pursued against Agent Kane or Katz. The judgment bar thus does not preclude the claims against Kane and Katz, and we must address those claims separately.

C.

1.

We next address the plaintiffs' contention that the district court improperly ruled that Agent Kane is entitled to qualified immunity on the substantive *Bivens* claim against him. In support of this claim, the plaintiffs assert that Kane contravened the Fourth Amendment by misrepresenting material facts in the Affidavit. More specifically, they pursue on appeal their theories that Kane made two such misrepresentations. First, the plaintiffs assert that Kane falsely "concocted the term 'Safa Group,' and defined it to comprise over one hundred 'related' individuals, including Dr. Unus." Br. of Appellants 33. Second, they contend that Kane misrepresented that Safa Group organizations had transferred money internationally in order to mask the ultimate destination of particular funds.

On the first alleged misrepresentation, the plaintiffs contend that Agent Kane's use of the Safa Group label was "critical" to his assertion that evidence of criminal activity could be found at each location for which a search warrant was sought (including the Unus residence). Thus, they maintain, the existence of a Safa Group was the only link between the suspect individuals and entities, permitting Kane to avoid the necessity of showing individualized probable cause for each location to be searched. *See* Br. of Appellants 33-34. According to the plaintiffs, because Dr. Unus was not suspected of committing any crimes, the only basis for probable cause to search the Unus residence was Dr. Unus's connection to the Safa Group. The plaintiffs assert that, had Kane not "con-

cocted" the Safa Group label, the magistrate judge would have concluded that the Affidavit failed to show probable cause to search the Unus residence, and she would have denied Kane's search warrant application. *Id.*

On the second such misrepresentation, the plaintiffs assert that Agent Kane misrepresented to the magistrate judge that Safa Group entities transferred money internationally. The Affidavit, they contend, "identifies two distinct categories of suspected crimes: (1) providing material support to foreign terrorist organizations and 'layering' transactions to cover this up, i.e., engaging in international transfers of money to promote offenses against foreign nations, and (2) conspiracy to defraud the IRS." Br. of Appellants 32. The plaintiffs maintain that, absent an actual international transfer of money, the Affidavit fails to show probable cause to believe that any of the persons or entities indentified therein had violated federal law.

Law enforcement officers are entitled to plead qualified immunity as an affirmative defense in lawsuits seeking money damages from them. *See Henry v. Purnell*, 501 F.3d 374, 376-77 (4th Cir. 2007). The qualified immunity defense "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). An officer is protected by qualified immunity unless he is shown to have (1) violated clearly established law (2) that a reasonable officer should have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 129 S. Ct. 808 (2009).[24]

---

[24]Under the test employed by the Supreme Court in *Saucier v. Katz*, courts were required to assess a qualified immunity defense in a two-step sequence. *See* 533 U.S. 194, 201 (2001). First, a court had to determine if the plaintiff had sufficiently alleged that the officer violated the plaintiff's constitutional rights. *See id.* Only if the answer to that first question was "yes" could the court then assess whether the right violated was a

We begin our qualified immunity analysis by assessing whether the plaintiffs sufficiently alleged that Agent Kane violated their constitutional rights. Accepting the truth of their allegations, we assess whether the plaintiffs have sufficiently alleged that Kane violated the Constitution. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006). The plaintiffs allege Kane contravened their Fourth Amendment rights in two ways: by using the "Safa Group" label and by alleging that Safa Group organizations had transferred money outside the United States.

In *Franks v. Delaware*, the Supreme Court recognized that an officer contravenes the Fourth Amendment when he procures a search warrant through the use of false statements, whereby a magistrate would not have otherwise found probable cause. *See* 438 U.S. 154, 155-56 (1978). We have explained that the initial step in assessing a *Franks* claim is determining whether the affiant made a false statement "deliberately" or with "reckless disregard for the truth." *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir. 2007). We recognized in *Miller* that

> [r]eckless disregard can be established by evidence that an officer acted with a high degree of awareness of [a statement's] probable falsity, that is, when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.

*Id.* (internal quotation marks omitted). Mere allegations of "negligence or innocent mistake," however, do not amount to

clearly established right of which a reasonable officer should have known. *See id.* In *Pearson*, the Court held that this sequence is no longer mandatory. *See* 129 S. Ct. at 818. Rather, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the particular circumstances of the case at hand." *Id.*

a constitutional violation. *Id.* at 627-28. If — and only if — there is a misrepresentation, the analysis then focuses on materiality of that misrepresentation. *See Franks*, 438 U.S. at 156; *Miller*, 475 F.3d at 629.

In addressing this issue, the district court explained from the bench that the plaintiffs had failed to provide "enough information to suggest that Agent Kane intentionally or recklessly attempted to mislead the magistrate judge in filing this affidavit." J.A. 1151. The court determined that "the affidavit is proper and that [Kane's] conduct in obtaining the affidavit was proper," thus concluding that Kane was "absolutely entitled to qualified immunity." *Id.*

2.

After carefully assessing the Affidavit in light of the plaintiffs' allegations, we agree with the court's analysis and conclude that the plaintiffs have failed to show that Kane violated the Fourth Amendment. By using the term "Safa Group," not only did Agent Kane not make a factual misrepresentation, he made no factual representation at all. He simply applied a label in order to shorthand the identification of the persons and entities being investigated. On the second page of the Affidavit, Kane stated, "For ease of reference, I will refer to the web of companies and charities . . . as the 'Safa Group.'" Affidavit 2 (emphasis omitted). Then, in his "executive summary," Kane again stated, "For the purpose of this affidavit, this group of individuals and the organizations that they operate will be referred to as the 'Safa Group.'" *Id.* at 6-7 (emphasis omitted). Kane thus made it clear to the magistrate judge that "Safa Group" was a mere label, not an attempt to short circuit the probable cause requirement; Kane could have used any term to identify these persons and organizations, and he simply chose to use the Safa Group label. Contrary to the plaintiffs' allegations, Kane carefully spelled out, in specific detail, the individuals and organizations suspected of having information regarding the underlying federal crimes, and how

searching specific locations could lead to discovering evidence of federal law violations. The plaintiffs thus fail to identify how Kane's use of the Safa Group label rose to the level of the unconstitutional conduct contemplated by *Franks* and *Miller*.

Likewise, the plaintiffs' assertion that Agent Kane misrepresented facts regarding international money transfers by suspect organizations also lacks merit. The essence of this allegation is that Kane stated in the Affidavit that certain of the suspect persons and organizations had transferred money overseas, when bank records show that no such transfers occurred. In the Affidavit, Kane primarily relied on two sets of documents: (1) IRS Forms 990 submitted by Safa Group entities showing that there had been financial transfers to entities on the Isle of Man; and (2) statements made during an IRS audit of a Safa Group entity. Furthermore, Kane identified other financial transfers of at least $200,000 by Safa Group entities in the United States to Canada, and the plaintiffs' counsel acknowledged that funds did in fact end up on the Isle of Man. *See* J.A. 1144-45 (explaining that Safa Group entity gifted funds to trust on Isle of Man).

Probable cause requires an affiant to show "'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). That some contradictory evidence may have been available, or may have come to light after Kane submitted his Affidavit to the magistrate judge, does not defeat the existence of probable cause.[25] Simply put, the plaintiffs fail to sufficiently

---

[25]We further observe that the plaintiffs' contention that there was no probable cause to search the Unus residence because Dr. Unus was not suspected of any crime misapprehends the standard of probable cause. By the Affidavit, Agent Kane sought a search warrant to investigate financial transactions involving a group of individuals and organizations suspected of violating federal law. Kane did not have to show probable cause that Dr. Unus had committed a federal crime, just that "'there [was] a fair probability that contraband or evidence of a crime [would] be found in'" the Unus residence. *Grubbs*, 547 U.S. at 95 (quoting *Gates*, 462 U.S. at 238).

allege that Kane — deliberately or with reckless disregard for the truth — made any material misrepresentations of fact in violation of the Constitution, and we therefore affirm the ruling of the district court that Kane is entitled to qualified immunity on the substantive *Bivens* claim.

D.

We next assess the plaintiffs' contention that the district court erred in dismissing their *Bivens* conspiracy and § 1985 claims against Katz.[26] In dismissing those claims, the court explained that, "because I haven't found anything wrong with the affidavit, that would absolutely cut off Ms. Katz's liability as to the search." J.A. 1151. As explained above, we agree with the district court that the plaintiffs have failed to sufficiently identify any factual misrepresentations in the Affidavit, and therefore, have failed to identify how Katz has caused any injury.

Although the plaintiffs allege that Katz conspired with Agent Kane to make material misrepresentations of fact to obtain the Warrant, they fail to allege a crucial component of any tort: causation. We have explained that, in order to establish a cause of action for a conspiracy under § 1985, a plaintiff must prove

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

---

[26]We have apparently never recognized a "*Bivens* conspiracy claim" as a substantive cause of action. Because the plaintiffs have failed to establish that there is a genuine issue of material fact with regard to this claim, however, we need not address whether such a cause of action is cognizable.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995); *see also Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (recognizing that "tort law causation" governs *Bivens* analysis).

In these proceedings, Katz cannot be tortiously liable for conspiring to violate the plaintiffs' constitutional rights because the plaintiffs have failed to identify any factual misrepresentations in the Affidavit, as detailed in the foregoing analysis of the substantive *Bivens* claim against Agent Kane. Absent such a misrepresentation, there is simply no link between Katz's role in the alleged conspiracy and the plaintiffs' complained-of injury. As a result, the plaintiffs have failed to state a claim against Katz on which relief can be granted, and we must affirm the district court's dismissal of the claims against her.

### E.

Finally, we must address the plaintiffs' challenge to the district court's award of attorney's fees to Katz. Recognizing that 42 U.S.C. § 1988 does not authorize an award of attorney's fees in a *Bivens* action, the court observed, in its Fee Order, that the plaintiffs had also sued Katz under § 1985, a cause of action for which § 1988 authorizes such a fee award. Thus, because the § 1985 claim and the *Bivens* conspiracy claim each "arose from the same nucleus of operative facts, and the Court dismissed both based on its finding that there had been no constitutional violation of plaintiffs' rights," the Fee Order concluded that a § 1988 fee award was appropriate for Katz's defense of those claims. Fee Order 2. After deciding that § 1988 authorized a fee award in this situation, the court ruled that Katz was entitled to such an award for legal work performed after the filing of the First Amended Complaint, because, "although plaintiffs may not have been aware when they filed the [Initial] Complaint that their claims were groundless, they should have been so aware before they filed the [First] Amended Complaint." *Id.* at 5.

1.

Pursuant to § 1988(b), the "prevailing party" in certain civil rights proceedings is entitled to recover attorney's fees. Although the explicit provisions of § 1988 do not distinguish between a prevailing plaintiff and a prevailing defendant, the courts have nevertheless drawn such a distinction. Under controlling precedent, a prevailing civil rights plaintiff is ordinarily entitled to receive an attorney's fee award as a matter of course. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) ("[A] prevailing plaintiff should ordinarily recover an attorney's fee [under § 1988] unless special circumstances would render such an award unjust." (internal quotation marks omitted)). A much stricter standard applies, however, when a court is requested to make such an award to a prevailing defendant. *See, e.g.*, *Jones v. Continental Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986) (describing fee award to civil rights defendant as "extreme sanction" reserved only for "truly egregious cases of misconduct").

In order for a prevailing defendant to be entitled to recover attorney's fees under § 1988, the plaintiff's claim must have been either "'frivolous, unreasonable, or groundless,'" or the plaintiff must have "'continued to litigate after [the claim] clearly became so.'" *Lotz Realty Co., Inc. v. U.S. Dept. of Housing & Urban Dev.*, 717 F.2d 929, 931 (4th Cir. 1983) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). Indeed, the mere fact that a civil rights plaintiff lost her case does not render her claim frivolous, unreasonable, or groundless. As the Supreme Court explained in this regard:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight

claims, for seldom can a prospective plaintiff be sure
of ultimate success.

*Christiansburg*, 434 U.S. at 421-22; *see also Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 303 (6th Cir. 2008) ("The Sixth Circuit affirms awards of attorney fees [to prevailing defendants under § 1988] only when plaintiffs relitigated already-settled legal matters, and we reverse the award of attorney fees when issues of law remained unresolved or when a plaintiff had an arguable basis for pursuing his or her claim." (internal quotation marks omitted)). The purpose of distinguishing between a fee award being made to a successful plaintiff, on the one hand, and such an award being made to a prevailing defendant, on the other, arises out of the legitimate concern for the "chilling effect" that the latter type of award would have on potential civil rights plaintiffs — and their lawyers — in deciding whether to initiate lawsuits. *See Lotz*, 717 F.2d at 932. We have explained, however, that "[w]hen a court imposes fees on a plaintiff who has pressed a 'frivolous' claim, it chills nothing that is worth encouraging." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).

2.

In this case, Katz prevailed on a claim for which § 1988 does not authorize a fee award (the *Bivens* conspiracy claim), as well as on a separate claim for which § 1988 makes such an authorization (the § 1985 claim). As explained below, without deciding whether § 1988 authorizes a fee award for the time Katz spent defending both those claims, we are content to reverse the fee award made to Katz because the plaintiffs' claims fail to qualify as either "frivolous, unreasonable, or groundless."

a.

The Fee Order provided three specific bases for its ruling that the plaintiffs should have been aware that their claims against Katz were frivolous, unreasonable, or groundless. First, the district court emphasized that, upon dismissing the Initial Complaint, it had "warned plaintiffs on the record that any Amended Complaint must include . . . specific allegations." Fee Order 4. But "[i]nstead of recognizing that their claims were groundless," the court explained, "plaintiffs filed an Amended Complaint that included only minor changes to their insufficient allegations of material misrepresentations." *Id.* Second, the court observed that one of the "asserted misrepresentations — that alleged associates of Dr. Unus had engaged in untraceable overseas money transfers — had already been rejected by another federal court," and the plaintiffs were thus on notice that their claims against Katz were groundless. *Id.*[27] Finally, according to the district court, the plaintiffs' motion for reconsideration "was based on a continued misunderstanding of the law of probable cause, an error that the Court [had previously] explained to plaintiffs in the January 11, 2005, hearing." *Id.* at 4-5.

By awarding attorney's fees to Katz, the district court abused its discretion, because the plaintiffs' claims against Katz were not frivolous, unreasonable, or groundless, and the "extreme sanction" of awarding such fees is thus unwarranted. *Jones*, 789 F.2d at 1232. More specifically, the record reveals that the court's three bases for its fee award are insufficient.

---

[27]In discussing the ruling made by "another federal court," the district court was referring to a defamation suit instituted against Katz in Georgia by Safa Group entities for statements that Katz made on national television. In those proceedings, the court concluded that the alleged misrepresentation regarding the international transfer of money was unavailing, and that the Affidavit established probable cause. *See Mar-Jac Poultry, Inc. v. United States*, No. 2:03-cv-00232 (N.D. Ga. June 21, 2004). That decision did not, however, involve an attorney's fee issue, and neither Aysha nor Hanaa Unus was a party to that litigation.

i.

First, in the Fee Order, the district court erred when it relied, as a basis for the fee award, on its conclusion that the plaintiffs had failed to replead their claims with greater specificity. In the Initial Complaint, the plaintiffs alleged simply that "Kane and Katz . . . conspired to contrive allegations that there were relevant financial documents located at the homes of certain individuals they wanted to search." Initial Complaint 5. The plaintiffs thus failed to support the alleged wrongdoing by Katz with specific facts. A comparison of the Initial Complaint and the First Amended Complaint, however, reveals that the plaintiffs heeded the court's instructions and supported their claims in the First Amended Complaint with, as instructed by the court, "the specific allegedly false statements that are in the affidavit and a description of why that falsity would be material to the ultimate finding of probable cause." J.A. 1032.

In the First Amended Complaint, the plaintiffs alleged, inter alia, that Kane and Katz made three material misrepresentations of fact in the Affidavit: (1) that Kane and Katz "invented the term 'Safa Group,'" and that no such group exists; (2) that Kane and Katz misrepresented that "alleged 'Safa Group' 'member' Dr. Unus had been under investigation since 2000"; and (3) that Kane and Katz misrepresented that Safa Group entities had transferred money internationally. First Amended Complaint 9. The First Amended Complaint also described how those misrepresentations were material to the probable cause determination. It alleged that the first misrepresentation was "material to a probable cause determination to search the Unus home because Dr. Unus is described as the billing and administrative contact for the IIIT" in the Affidavit. *Id.* Absent a link between the IIIT and the Safa Group, the First Amended Complaint asserted, there was no probable cause to search the Unus residence. The second misrepresentation was relevant to the probable cause issue because it gave the false impression that Dr. Unus had been

under investigation by the federal government. And, with respect to the third misrepresentation, the First Amended Complaint explained, "Kane and Katz knowingly proffered a false money laundering claim which, when added to the false claim of a close relationship between and among over one hundred entities and individuals, convinced the Magistrate to approve a warrant to search the Unus home." *Id.* at 10. Thus, although the plaintiffs' allegations ultimately failed to survive a Rule 12(b)(6) motion, the plaintiffs had substantially complied with the court's earlier instructions when it dismissed the Initial Complaint, and the Fee Order improperly relied on a finding to the contrary as a basis for the fee award.

### ii.

Second, we find unavailing the district court's pronouncement that the plaintiffs' claims were groundless because a district court in Georgia had ruled that the Affidavit established probable cause. Although we agree that the Affidavit established probable cause, the Georgia court's ruling is neither controlling nor probative here. And, as nonparticipants in the Georgia litigation, the plaintiffs should not be held to suffer its effects. *Cf. Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (recognizing that res judicata requires, inter alia, claims by same parties or privies). Furthermore, the Georgia court's ruling touched on only one of the alleged misrepresentations, thus having no potential impact on the other asserted bases of the plaintiffs' claims against Katz.

### iii.

Finally, the mere fact that the plaintiffs' lawyers misunderstood certain legal aspects of the probable cause issue does not render the First Amended Complaint frivolous, unreasonable, or groundless. Indeed, it was entirely reasonable for the plaintiffs and their lawyers to seek court review of the search warrant process, because the Warrant was premised — at least

to some extent — on Katz's off-the-wall theory that all members of one of the world's major religions are terrorists. *See* First Amended Complaint 5 (alleging that Katz's "belief that all Muslims are terrorists was conveyed to the agents," including Agent Kane). This theory was allegedly espoused by Katz in her book on terrorism, called *Terrorist Hunter*, in which she also referred to herself as the Green Quest investigation's "stealthy guiding beam," and the Safa Group investigation as "[her] investigation, [her] baby, [her] project." *Id.* at 18 (internal quotation marks omitted).[28] Furthermore, the plaintiffs alleged that Katz had continually urged Kane to seek search warrants, despite Katz having been advised by "one or more" federal prosecutors that there was no probable cause to search the homes of the individuals associated with the Safa Group, such as Dr. Unus. *See id.* at 6-7.[29] Though ultimately unsuccessful, the sum of the plaintiffs' contentions — that Katz, driven by a religion-based animus, had conspired with federal agents to manufacture probable cause to obtain unlawful search warrants — was certainly nonfrivolous and warranted serious and careful judicial consideration. *Cf. Hughes v. Rowe*, 449 U.S. 5, 15 (1980) ("Even those allegations that were properly dismissed for failure to state a claim deserved and received the careful consideration of both the District Court and the Court of Appeals."); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 354 n.4 (4th Cir. 2003) (affirming denial of § 1988 fee claim pursued by prevailing defendant).

---

[28]These specific allegations — about all Muslims being terrorists and Katz claiming the federal investigation as her own — were first made in the First Amended Complaint, after the district court had directed the plaintiffs to particularize the claims made in the Initial Complaint.

[29]In her book, Katz favorably describes how she convinced the United States Attorney to approve an application for several search warrants, including the Warrant to search the Unus residence, despite his initial reticence. *See Terrorist Hunter* 322-23.

b.

Significantly, both the district court and Katz — in support of the fee award — relied on our *Hutchinson* precedent, where we reinstated fee awards to prevailing civil rights defendants. *See* Fee Order 1, 3 (citing *Hutchinson*, 994 F.2d at 1080); Br. of Appellee Katz 48, 52 (same). That decision, however, involved much more egregious conduct than that presented here. In *Hutchinson*, the defendants prevailed after years of vexatious litigation. The plaintiffs — who lost an election — had, as Judge Wilkinson explained, "alleged a two-county-wide election-rigging conspiracy worthy of an Oliver Stone screenplay." *Hutchinson*, 994 F.2d at 1081. In reinstating the fee awards, our panel emphasized that the plaintiffs had narrowly survived a Rule 12(b)(6) motion to dismiss, and that they "were unable to back their conspiracy theory [at trial] with anything beyond conjecture and specula- tion." *Id.* at 1080. Furthermore, the plaintiffs were found by the district court as motivated by revenge and a desire to pro- long the litigation. *See id.* In such circumstances, the fee awards were deemed justified because the "defendants were forced for several years, and at great expense, to fend off a claim that proved to be factually baseless." *Id.* at 1081.

In *DeBauche v. Trani*, in 1999, we reviewed a § 1988 fee award to a prevailing civil rights defendant. *See* 191 F.3d 499 (4th Cir. 1999). In that litigation, the plaintiff, a minority- party gubernatorial candidate in Virginia, had sued a host of individuals under 42 U.S.C. § 1983 for conspiring to deny him the opportunity to participate in a political debate con- ducted at a public university. One of the defendants, a talk show host and former Governor of the Commonwealth, had successfully defended against the suit, and the court awarded him attorney's fees under § 1988. *See id.* at 503-04. In affirm- ing the fee award for our Court, Judge Niemeyer emphasized the frivolous nature of the plaintiff's claims. "Both the Supreme Court and our court," he explained, "have been very clear" that the Constitution does not apply to purely private

actors such as the defendant, and therefore it was well-settled that a § 1983 claim against the defendant was legally ground-less. *Id.* at 510. Thus, under those circumstances, the district court was within its discretion to award fees under § 1988. *See id.*

Importantly, the plaintiffs in this case supported their con-spiracy claims against Katz in the First Amended Complaint with specific factual allegations, rather than — as in *Hutchin-son* — with mere conjecture and speculation. And this record lacks any indication that the plaintiffs were somehow moti-vated out of spite to prolong the litigation or increase the liti-gation costs. Unlike the claims asserted in *DeBauche*, those made against Katz were not predicated on plainly baseless causes of action that ran counter to established legal princi-ples. Rather, the claims against Katz, viewed in an objective light by a reasonable lawyer, allege unsettling, discrimination-fueled acts by Katz that — though ultimately unsuccessful — were not undeserving of serious and careful consideration in a court of law. In awarding fees to Katz, the district court thus seems to have engaged in the "kind of hindsight logic [that] could discourage all but the most airtight claims." *Christians-burg*, 434 U.S. at 422; *see also LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir. 1998) (urging caution in assessing fee award issues — particularly on conspiracy claims — involving prevailing civil rights defendants). As a result, the plaintiffs' claims against Katz were neither frivo-lous, unreasonable, or groundless, the court abused its discre-tion in making the fee award to Katz as a prevailing defendant, and we reverse the award.[30]

---

[30]Because the claims against Katz were neither frivolous, unreasonable, nor groundless, the plaintiffs did not continue to litigate those claims after they clearly became so. *See* Fee Order 5. That aspect of the district court's ruling is thus undermined.

## IV.

Pursuant to the foregoing, we affirm the district court's dismissal of the claims alleged against Agent Kane, Katz, and the federal agent defendants, as well as its summary judgment award in favor of the United States. We reverse, however, the attorney's fee award made to Katz.

*AFFIRMED IN PART*
*AND REVERSED IN PART*

WILLIAMS, Chief Judge, concurring in part and dissenting in part:

I agree with the majority's resolution of the constitutional and common law tort claims asserted by Aysha and Hanaa Unus and concur in those portions of the opinion. For the reasons stated in the district court's fee order of April 28, 2005, however, I would affirm the award of attorney's fees in favor of Rita Katz. I therefore respectfully dissent from Part III.E. of the majority opinion and from the judgment to the extent it reverses that award.